# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 07-2651

_____

| | |
|---|---|
| Daniel Pucket, in his own capacity; Amy Pucket, in her own capacity; Luke Pucket, by and through his parents and guardians, Daniel and Amy Pucket; Benjamin Pucket, by and through his parents and guardians, Daniel and Amy Pucket, | * * * * * * * * |
| Appellants, | * |
| | * |
| v. | * |
| | * |
| Hot Springs School District No. 23-2; Hot Springs School Board, | * * * |
| Appellees, | * * |
| ---------------------------- | * * |
| Lawrence Long; in his official capacity as Attorney General of South Dakota, | * * * * |
| Intervenor Defendant - Appellee. | * * |

Appeal from the United States District Court for the District of South Dakota.

_____

Submitted: March 14, 2008
Filed: May 23, 2008

_____

Before RILEY, GRUENDER and SHEPHERD, Circuit Judges.
_____

GRUENDER, Circuit Judge.

The Hot Springs School District 23-2 and Hot Springs School Board ("School District") discontinued busing students of Bethesda Lutheran School ("Bethesda"), a private religious school located within the School District's boundaries. Daniel, Amy, Luke and Benjamin Pucket ("Puckets"), parents of students and students enrolled at Bethesda, filed an action under 42 U.S.C. § 1983, arguing that the School District's termination of busing services for Bethesda students violated the First and Fourteenth Amendments of the United States Constitution. The Puckets argue that the School District unconstitutionally deprived them of busing services because it relied on two allegedly unconstitutional provisions of the South Dakota Constitution to terminate the busing services. South Dakota Attorney General Lawrence Long ("State") intervened to defend the state constitution provisions. The district court[1] granted the summary judgment motions of the School District and the State. On appeal we conclude that the Puckets lack standing to bring this lawsuit, and we affirm the dismissal.

I.     BACKGROUND

Prior to the 2002-2003 school year, the School District provided bus transportation to students attending Bethesda who lived along existing School District bus routes. On March 21, 2002, the School District received a letter from Linda Joski, an account executive at Arthur J. Gallagher & Co., the administrator for the School District's automobile liability insurance policy. The letter informed the School District that "[i]t has come to our attention that Hot Springs School District is

_____
[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

transporting children for a local parochial school." The letter requested that the School District discontinue busing as soon as possible and no later than the beginning of the 2002-2003 school year because "this activity would not be considered 'school sponsored'" and thus "create[d] a liability situation which [was] beyond the scope" of the School District's insurance policy. Beth Spitzer, Bethesda's principal, learned of the insurance problem from a School District employee.

In July 2002, the Association of School Boards ("Association"), of which the School District was a member, received a letter from its counsel, who was also counsel for the School District, addressing the issue of insurance coverage for school districts providing busing for private-school children. In the letter, counsel noted that in South Dakota Attorney General Opinion 92-04 ("Opinion 92-04") the Attorney General determined that a public school district lacked the statutory authority to provide busing for children attending a religious school and questioned whether such an arrangement would be constitutional even if statutory authority permitted it. Counsel concluded that an insurance company could deny coverage to a school district busing private-school children. The School District also received a copy of this letter.

The School District decided to discontinue busing Bethesda students in accordance with its insurance administrator's request by the start of the 2002-2003 school year. On October 31, 2002, the School District's attorney contacted the South Dakota Attorney General to request a formal opinion on the question of whether a school district was authorized to transport private-school children. On November 6, 2002, the Attorney General's office responded by stating that, "this issue has been addressed in official Opinion No. 92-04."

The South Dakota Attorney General prepared Opinion 92-04 in 1992 in response to a question by another South Dakota school district regarding the legality of a public school district's providing busing to students of a church-operated preschool. Opinion 92-04 concluded that school districts could not provide

simultaneous busing to public and nonpublic school students based on South Dakota statutes that regulate busing, particularly South Dakota Codified Laws §§ 13-24-20 and 13-29-1. Section 13-24-20 states that

> The school board may grant the use of school facilities, computers, motor vehicles, or land belonging to the school district for any purposes which it considers advisable as a community service for such compensation as it determines. . . . The use may not interfere with school activities. Any person or persons or public body using such school facilities, computers, motor vehicles, or land is responsible to the school district for any and all damages that may be caused by reason of the use or occupancy.

Under § 13-29-1

> The school board of any school district may acquire, own, operate, or hire buses for the transportation of students to and from its schools either from within or without the district or for transportation to and from athletic, musical, speech, and other interscholastic contests in which participation is authorized by the school board.

While Opinion 92-04 noted that "[n]othing on the face of [§ 13-24-20] would prohibit simultaneous public and private use of a bus," the Attorney General concluded that "when the entire scheme on public and private use of school buses is considered, it is my opinion that simultaneous public and private use of a school bus is not permissible under the existing statute." Opinion 92-04 also expressed "serious doubts" as to whether, even if busing was allowed under South Dakota statutes, it would be permissible under the South Dakota Constitution Article VI, § 3, which provides that "[n]o money or property of the state shall be given or appropriated for the benefit of

any sectarian or religious society or institution" and Article VIII, § 16, which states that "[n]o appropriation of lands, money or other property or credits to aid any sectarian school shall ever be made by the state."[2]

At a December 9, 2002 meeting and in response to Spitzer's repeated requests, the School District's board passed a motion stating: "The district would not allow Bethesda Lutheran School students bus service because it was declared unconstitutional by the South Dakota Attorney General and the loss of the district catastrophic insurance coverage if bus service is provided." As directed by the Puckets' counsel, Spitzer specifically requested that the School District's motion include a statement that the board was relying on the Attorney General's opinion that public schools' busing of private-school children would violate the South Dakota Constitution.

Following that meeting, on January 22, 2003, Vern Hagedorn, the School District's superintendent, recorded in his "busing log"[3] that the School District had offered to help Bethesda introduce legislation to allow busing for Bethesda students, "but all she [Spitzer] wanted was a statement that we wouldn't transport their students." The next day Spitzer recorded in her busing log that the counsel for the

_____

[2]The Puckets refer to these provisions of the South Dakota Constitution as the "Blaine Amendments," because they were modeled after a United States constitutional amendment proposed by Congressman James G. Blaine in the late nineteenth century. Br. of Appellant at 5-7. The Puckets argue that the Blaine Amendments violate the United States Constitution because they had a discriminatory purpose, targeting religious minorities, particularly Catholics and Lutherans. *Id*. at 42-43. However, because we conclude that the Puckets lack standing, we do not reach their argument that the Blaine Amendments unconstitutionally disqualify them from the government benefit of busing based on their religious status.

[3]Both Hagedorn and Spitzer kept their own sets of detailed notes on the events that occurred regarding the busing, and both referred to these notes as their "busing logs."

Association and the School District had called her and "want[ed] to pursue legislative action," but that she responded by telling him that "there was going to be a lawsuit."

Shortly thereafter, the South Dakota legislature passed South Dakota Codified Law § 13-29-1.2, which was effective immediately when the governor signed the bill on March 3, 2003. It stated in relevant part:

> School districts may provide transportation to nonpublic school students if no additional public funds are expended to provide the transportation. No school district, however, is required under this section to provide transportation to nonpublic school students.

On February 28, 2003, the School District learned that, in anticipation of the enactment of § 13-29-1.2, busing Bethesda students would no longer impact the School District's liability insurance. Although the Puckets did not request that the School District reinstate busing for Bethesda students after § 13-29-1.2 became effective, the School District did so on May 16, 2003.

However, on April 23, 2003, prior to the reinstatement of busing, the Puckets filed this lawsuit against the School District under 42 U.S.C. § 1983 for its failure to bus Bethesda students. The Puckets claimed that the decision not to bus Bethesda students violated the First and Fourteenth Amendments of the United States Constitution. Their complaint, which was served on the School District on May 8, 2003, alleged that the School District violated the Equal Protection and Free Exercise Clauses of the Constitution by denying Bethesda students busing based on their religion, that the School District violated the Free Speech Clause of the Constitution by denying Bethesda students busing because it teaches from a religious viewpoint, and that the School District violated the Establishment Clause of the Constitution by denying Bethesda students busing based on the South Dakota Constitution provisions, which it claimed was "applied to disfavor all faiths deemed 'sectarian.'" The State intervened to defend the constitutionality of the South Dakota Constitution provisions. The School District and the State filed motions for summary judgment.

Granting the motions for summary judgment of the School District and the State, the district court found that the Puckets lacked standing to sue prior to March 3, 2003, when § 13-29-1.2 became effective, because school districts did not have legal authority to bus private-school children under §§ 13-24-20, 13-29-1 and 13-29-1.1. Because the School District lacked legal authority to bus private-school children, the district court determined that the Puckets could not show that the School District's actions caused an injury-in-fact. While the district court held that the Puckets had standing after March 3, 2003, it also concluded that no reasonable jury could find that the School District's failure to reinstate busing between March 3 and May 16, 2003, was based on the South Dakota Constitution provisions. Therefore, the court declined to decide whether the South Dakota Constitution provisions violated the United States Constitution. The court, however, did find that the School District's policy of refusing to bus Bethesda students did not violate the First and Fourteenth Amendments to the Constitution.

The Puckets appeal the district court's decision, arguing the district court erred in concluding that they did not have standing before March 3, 2003; that no reasonable jury could find that the School District's failure to reinstate busing between March 3 and May 16, 2003, was based on the South Dakota Constitution provisions; and that the School District's policy did not violate the First and Fourteenth Amendments. The Puckets also urge us to find that the South Dakota Constitution provisions violate the United States Constitution. We conclude that the Puckets did not have standing either before or after March 3, 2003.

## II.  DISCUSSION

The district court granted summary judgment, which we review de novo "and may affirm on any basis supported by the record." *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000). Standing, however, is a jurisdictional requirement, and thus "can be raised by the court sua sponte at any time during the litigation." *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004).

Under Article III of the United States Constitution, federal courts may only adjudicate actual cases and controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). "The core component of the requirement that a litigant have standing to invoke the authority of a federal court is an essential and unchanging part of the case-or-controversy requirement of Article III." *DaimlerChrysler*, 547 U.S. at 342 (internal quotations omitted).

"To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). To have standing a plaintiff must demonstrate more than simply a "generalized grievance." *United States v. Hays*, 515 U.S. 737, 743 (1995). The injury must be "concrete," not "conjectural" or "hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "Typically . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984). We must view these requirements in light of the Article III "notion that federal courts may exercise power only in the last resort, and as a necessity, and only when adjudication is consistent with a system of separated powers and the dispute is one traditionally thought to be capable of resolution through the judicial process." *Id.* (internal quotations and citation omitted) (alteration omitted).

### A. August 2002 to March 3, 2003

The district court concluded that the Puckets lacked standing to assert a claim based on the period from August 2002, when the School District discontinued busing, until March 3, 2003, when § 13-29-1.2, which specifically gave school districts discretion to bus private-school children, became effective. The district court concluded that prior to the enactment of § 13-29-1.2, public school districts were not authorized to bus private-school children under South Dakota law. Thus, the court concluded that the Puckets lacked standing to sue as they suffered no injury-in-fact based on the School District's decision to discontinue busing Bethesda students, because the School District did not have statutory authority to do so. On appeal the Puckets argue that the district court erred by misinterpreting the South Dakota statutes at issue and by failing to consider the legislative history of § 13-29-1.2.

"[S]chool boards are creatures of statute with limited powers. Therefore, a school board cannot exercise power unless it is expressly granted or necessarily implied by statute." *In re Writ of Certiorari as to Wrongful Payments of Attorney Fees Made by Brookings Sch. Dist. Sch. Bd.*, 668 N.W.2d 538, 542 (S.D. 2003). "[A]ny power sought to be exercised must be found within the four corners of the statute under which they proceed." *Sunnywood Common Sch. Dist. No. 46 of Minnehaha County v. County Bd. of Educ. of Minnehaha County*, 131 N.W.2d 105, 110 (S.D. 1964). When powers are necessarily implied from a statute, the implication "should be clear and undoubted, and the party claiming through [it] should be able to point [it] out with certainty and precision. . . . Implications spring from the necessities of some power actually conferred, and not from notions of what would be convenient or expedient under particular circumstances." *State ex rel. Bell v. Bd. of County Comm'rs of Beadle County*, 300 N.W. 832, 834 (S.D. 1941) (quotation omitted).

When determining the scope of a school board's authority, we must examine the statutes that govern school boards. We begin with the plain language of each

statute and try to "ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary and commonly understood meaning." *In re M & S Grading, Inc.*, 457 F.3d 898, 901 (8th Cir. 2006) (quotation omitted). It is well established that "courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part." *Branch v. Smith*, 538 U.S. 254, 281 (2003). "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them." *United States v. Freeman*, 44 U.S. 556, 564 (1845).

As the district court correctly explained, § 13-29-1 does not provide authority for the School District to bus Bethesda students. Under § 13-29-1, school districts may bus students "to and from *its* schools" or for "athletic, musical, speech, and other interscholastic contests." (Emphasis added). Bethesda is not one of the School District's schools, and Bethesda students are not being bused to athletic, musical, speech or other interscholastic contests. Thus, we conclude that the plain language of § 13-29-1 does not authorize the School District to bus Bethesda students.

The Puckets also argue that the district court erred in its interpretation of §§ 13-24-20 and 13-29-1.1. Section 13-24-20 states, in relevant part, that "[t]he school board may grant the use of school facilities, computers, motor vehicles, or land belonging to the school district for any purposes which it considers advisable as a community service for such compensation as it determines. . . . The use may not interfere with school activities." Section 13-29-1.1 provides that "[a] school board may allow nonprofit civic organizations or other government entities to use vehicles owned by the school district to transport persons to various activities deemed by the school board to be in the public interest."

Both statutes authorize school boards to grant or allow others, including nonprofit organizations, to "use" a school district's vehicles. "Use" is defined as "to put or bring into action or service." *Webster's New World Dictionary of the American*

-10-

*Language* 1564 (2d College ed. 1984). Riding as a passenger in a vehicle does not constitute putting the vehicle into action or service. Accordingly, applying the ordinary meaning of "use," we conclude that §§ 13-24-20 and 13-29-1.1 merely authorize the School District to allow a nonprofit organization actually to operate the School District's motor vehicles.

The Puckets argue that "use" by a nonprofit, nonpublic school includes students enrolled at that school riding on buses operated by drivers employed by the School District. However, this broad interpretation of "use" is not consistent with the command that any power sought to be exercised by a school district must be either expressly granted or necessarily implied by the statute. *See In re Writ of Certiorari as to Wrongful Payments of Attorney Fees Made by Brookings Sch. Dist. Sch. Bd.*, 668 N.W.2d at 542. Such a reading also is inconsistent with the language of other South Dakota statutes regulating busing. Section 13-29-1 authorizes school districts to provide "transportation" of students to and from its schools and interscholastic contests, and § 13-29-1.2 now authorizes school districts to provide "transportation" to nonpublic school students to and from their schools. Neither of those statutes employ the word "use." When intending to enable a school district to provide busing services to its students,[4] the South Dakota legislature notably chose the phrase "provide transportation." If the legislature intended § 13-24-20 or § 13-29-1.1 to authorize school districts to provide busing services to private-school children, it would have expressed that intent by using the word "transportation." The fact that the legislature instead chose the word "use" indicates that the legislature did not intend for either of these statutes to permit school districts to provide busing services for private-school children. Rather, the plain language of §§ 13-24-20 and 13-29-1.1

---

[4]We note that here we are discussing a school district's ability to provide busing for private-school children from their homes to their schools. We are not discussing, or deciding, a school district's ability to provide busing for private-school children to and from interscholastic contests.

authorizes a school district to allow other nonprofit groups to "use" its buses, employing their own drivers.[5]

Finally, the Puckets argue that we should consider the legislative history of § 13-29-1.2, which they claim supports their argument. The Puckets rely on statements of two legislators regarding the passage of § 13-29-1.2 to support their claim that the legislature passed § 13-29-1.2 only to clarify and confirm that school districts already had the authority to bus private-school children. However, when "statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative." *N. States Power Co. v. United States*, 73 F.3d 764, 766 (8th Cir. 1996). As the district court noted, if school districts had the authority to transport private-school children to and from school, the legislature would not have needed to enact § 13-29-1.2. *See Nat'l Farmers Union Prop. & Cas. Co. v. Universal Underwriters Ins. Co.*, 534 N.W.2d 63, 65 (S.D. 1995) ("The legislature does not intend to insert surplusage in its enactments."). Accordingly, South Dakota law did not authorize the School District to bus Bethesda students until § 13-29-1.2 became effective on March 3, 2003.

The Puckets cannot show that the School District's alleged discrimination caused their injury because the School District did not have the statutory authority to bus the Puckets or any other Bethesda students before March 3, 2003. *See, e.g.*, *Donaghy v. City of Omaha*, 933 F.2d 1448, 1455 (8th Cir. 1991) (holding that police

---

[5]We believe that the South Dakota Supreme Court would agree with our analysis of the South Dakota busing statutes. *See Brown v. Egan Consol. Sch. Dist. #50-2*, 449 N.W.2d 259, 261 (S.D. 1989) (noting that "use by the school district to transport students to and from school and interscholastic activities" was not the same as "the granting of use of buses" to nonprofit organizations and that § 13-29-1 authorized the school district's use of buses to transport *its own students to and from school* or for interscholastic contests") (emphasis added).

officer lacked standing to challenge city's race-conscious employment decisions because, even if the city had only promoted based on rank order, he would not have been promoted based on his rank); *Grahek v. City of St. Paul*, 84 F.3d 296, 299 (8th Cir. 1996) (citing *Donaghy* in finding that the plaintiff lacked standing to sue because he would not have been referred for openings for which he applied even if the police chief had not applied an affirmative-action plan); *Wilson v. Glenwood Intermountain Props.*, 98 F.3d 590, 593 (10th Cir. 1996) ("[A] person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of the benefit."); *see also* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3531.5, at 452 (2d ed. 1984) ("Causation is most easily rejected when a plaintiff challenges the denial of a benefit on one ground, and it is shown that the plaintiff is in any event ineligible for the benefit on some other ground."). Therefore, we agree with the district court that the Puckets lack standing to challenge the School District's decision to discontinue busing Bethesda students prior to March 3, 2003.[6]

---

[6]The district court disregarded Opinion 92-04 because some of the statutes upon which the Opinion was based were subsequently repealed or amended. The Puckets contend that the district court erred by disregarding Opinion 92-04 and argue that Opinion 92-04 compels us to interpret § 13-24-20 as authorizing busing because it noted that "[n]othing on the face of that statute would prohibit simultaneous public and private use of a bus." However, South Dakota Attorney General opinions are not binding. *See Brim v. South Dakota Bd. of Pardons & Paroles*, 563 N.W.2d 812, 816 (S.D. 1997). Moreover, even if we were bound or chose to consider Opinion 92-04, it ultimately concluded that a public school was not authorized by statute to bus private-school children, which supports our conclusion.

**B.      March 3, 2003 to May 16, 2003**

After March 3, 2003, § 13-29-1.2 specifically authorized the School District to bus Bethesda students, but it did not require the School District to do so.  The law stated that "[s]chool districts *may* provide transportation to nonpublic school students if no additional public funds are expended to provide the transportation."   S.D. Codified Law § 13-29-1.2 (emphasis added).

As noted above, a plaintiff may not simply allege a generalized grievance, but he or she must instead demonstrate a concrete injury.  In analyzing standing, the Supreme Court has repeatedly found that a plaintiff lacks standing to sue when the plaintiff cannot demonstrate specific injuries.  *See, e.g.*, *Lujan*, 504 U.S. 555; *Warth v. Seldin*, 422 U.S. 490 (1975).

In *Warth*, various plaintiffs, including a home builders' association, challenged allegedly discriminatory zoning ordinances.  422 U.S. at 495.  The Supreme Court held that members of the home builders' association lacked standing because "[t]he complaint refer[red] to no specific project of any of its members that [was] currently precluded either by the ordinance or by respondents' action in enforcing it."  *Id*. at 516.  The complaint did not claim that any member had applied for a building permit or variance for any current project, and there was "no indication that respondents . . . delayed or thwarted any project currently proposed by Home Builders' members, or that any of its members . . . [took] advantage of the remedial processes available under the ordinance."  *Id*.  The Court concluded that "insofar as the complaint [sought] prospective relief, Home Builders . . . failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention."  *Id*. The Court also rejected the claims of another plaintiff when "neither the complaint nor any materials of record indicate[d] that any member of Housing Council . . . [took] any step toward building housing in Penfield."  *Id*. at 517.  Thus, the Court concluded

-14-

that the plaintiffs lacked standing when they failed to demonstrate even a mere application for a building permit or zoning variance. *Id*. at 516.

Likewise in *Lujan*, the Supreme Court held that simply demonstrating past travels to certain international destinations and the desire to return there without specific travel plans failed to support standing for two members of the Defenders of Wildlife who were challenging a rule promulgated by the Secretary of the Interior. 504 U.S. at 562-64. In the Endangered Species Act of 1973 ("ESA"), Congress passed a "citizen-suit" provision, allowing a private citizen to sue to enjoin anyone alleged to be in violation of the ESA. *Id*. at 571-72. The members of the Defenders of Wildlife were challenging a rule promulgated by the Secretary of the Interior interpreting § 7 of the ESA, which required federal agencies to consult with the Secretary of the Interior to ensure that projects they funded did not threaten endangered species. *Id*. at 557-58. The Secretary interpreted § 7 of the ESA to apply only to actions taken in the United States or on the high seas, and not to actions taken in foreign nations. *Id*. at 559. The two members of the Defenders of Wildlife claimed that this interpretation would increase the rate of extinction of endangered and threatened species. *Id*. at 562. The members stated in affidavits that they had previously visited Egypt and Sri Lanka and intended to do so again with hopes of observing the native endangered animals in their natural habitats. *Id*. at 563-64. The Court found that these two members' profession of their intent to return "without any description of concrete plans, or indeed even any specification of *when* the some day [would] be [did] not support a finding of the 'actual or imminent injury' required to establish standing." *Id*. at 564.

Other courts also have found that if a plaintiff is required to meet a precondition or follow a certain procedure to engage in an activity or enjoy a benefit and fails to attempt to do so, that plaintiff lacks standing to sue because he or she should have at least taken steps to attempt to satisfy the precondition. *See, e.g.*, *T.L.J. v. Webster*, 792 F.2d 734, 739 n.5, 740 (8th Cir. 1986) (finding that plaintiffs lacked standing to

challenge procedures to obtain a bypass to required parental consent for an abortion when they had never attempted to obtain the judicial bypass); *Gilles v. Davis*, 427 F.3d 197, 208 (3d Cir. 2005) (holding that a campus speaker lacked standing to challenge the university's permit policy because the speaker never applied for a permit); *Interstate Commerce Comm'n v. Appleyard*, 513 F.2d 575, 577 (4th Cir. 1975) (concluding that a trucker lacked standing to challenge an injunction against operating without a certificate or permit from the ICC when he failed to show that he ever applied for a permit or that he could not obtain one).

Here, there is no evidence that the Puckets actually requested that the School District reinstate busing after § 13-29-1.2 became effective on March 3, 2003. The Puckets' counsel confirmed at oral argument before this court that the Puckets did not request that busing be resumed after § 13-29-1.2 became effective, instead assuming that the School District understood what the Puckets wanted without a specific request.[7] In her deposition, Spitzer acknowledged that she never asked anyone from

---

[7]At oral argument, the following exchange occurred:

Q: Why did your clients not just go back after March 3, go back to the district – to the School District – say, you have statutory authority now, will you bus? Go in front of a board meeting, do whatever you had to do to get the issue before the board instead of suing them. Why didn't you just go say, are you going to bus?
A: Well, they waited 75 days, waited and waited, and no word came from the school district.
* * *
Q: Why didn't they go to the School District and simply ask them, we'd like you to bus our kids, are you going to do it or not?
A: It was understood, your honor. . . .
Q: Why isn't it reasonable to just think, well they're not asking for it, they must not want it anymore?
A: Well *they didn't ask for it* because the board had not reversed their [sic] decision. (Emphasis added).

-16-

the School District to reinstate busing of Bethesda students after March 3, 2003, and that she did not have the Puckets request that the School District resume busing either. Puckets' App. at 283.

However, we may find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile. *See, e.g.*, *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982) (holding that plaintiffs had standing to challenge Nebraska water laws even though they had not applied for a permit because the permit clearly would not have been granted and the application would have been futile); *S.D. Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1008-09 (8th Cir. 1998) (holding that plaintiffs had standing to challenge a county ordinance that prohibited issuance of new permits for surface metal mining even though they had not applied for a permit because any application would have been futile); *Bach v. Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005) (finding that a Virginia resident had standing to challenge a New York statute prohibiting issuance of a concealed-weapon permit even though he had not applied for a permit because he had been told that he was ineligible and applying for a permit would have been futile).

Here, though, there was no allegation or evidence that a request by the Puckets to reinstate busing of Bethesda students after § 13-29-1.2 became effective would have been futile. In fact, the record indicates that the School District made it clear that it was willing to resume busing for the Bethesda students as soon as it was authorized to do so and as soon as the insurance issue was resolved. Spitzer's busing log demonstrates repeated instances of the efforts of Hagedorn and others associated with the School District to reinstate busing. She recorded that Hagedorn told her that the majority of the School District's board wanted to continue busing and that Hagedorn was working to resolve the insurance issue. Even while passing the official motion to discontinue busing, which occurred only at Spitzer's request, the board members clearly expressed their support for Bethesda students, with one member noting that

-17-

"all of you[] should know that there isn't a single one of us sitting at this table that doesn't want your kids picked up."

Even after it stopped busing Bethesda students, the School District actively sought legislation authorizing it to resume busing them. Spitzer noted in her busing log that Tom Harmon, the School District's attorney, told her that the School District was interested in proposing legislation to resolve the issue and thought it could be resolved by the end of February 2003 and that Hagedorn said he would help support legislation authorizing busing when it was proposed. At the December 9, 2002 school board meeting, one board member suggested that those in attendance contact the state legislature to get the legislation introduced. Hagedorn said that he had told Spitzer that he would write letters of support and offered to go to a hearing before the legislature to support any proposed legislation. The School District's board even offered to contact specific legislators who could sponsor the bill. The School District's expressed support, continuous efforts to resolve the busing issue and willingness to work to get legislation passed so that it could bus Bethesda's students all indicate that a request to resume busing after § 13-29-1.2 became effective almost certainly would have been successful and would not have been futile.

The Puckets argue that the School District should have known that they still wanted busing or should have understood that their request was ongoing. In fact, their counsel claimed at oral argument that "*they didn't ask for it* because the board had not reversed their decision," but the School District had no reason to believe that the Puckets wanted busing to resume without a specific request. The Puckets' counsel offered that it was "understood" that they wanted busing resumed. However, by proffering a nebulous claim that the School District should have "understood" that the Puckets wanted busing resumed without actually requesting it, the Puckets "failed to show the existence of any injury . . . to warrant judicial intervention." *See Warth*, 422 U.S. 516. This is especially true in light of the School District's ongoing expression of its desire to resume busing as soon as it was authorized to do so.

In fact, the evidence leads us to believe that the Puckets may well have deliberately failed to request that the School District reinstate busing in an attempt to create a case or controversy for the overriding purpose of challenging the constitutionality of the South Dakota Constitution provisions. Spitzer, at the behest of the Puckets' attorney, requested that the motion terminating busing include a statement that the School District was discontinuing busing based on the South Dakota Constitution. Despite being aware of the School District's willingness to further the legislative efforts to allow its busing of Bethesda students, neither Spitzer nor the Puckets even inquired about the School District's willingness to resume busing after the new law became effective. In fact, upon hearing that the School District wanted to pursue legislative action to quickly resolve the busing problem, instead of offering to work with the School District to get legislation passed, Spitzer responded by stating that "there was going to be a lawsuit." On appeal, the Puckets dedicated nearly half of their argument solely to attacking the South Dakota Constitution provisions. In light of the strong evidence that the School District would have resumed busing if the Puckets had requested it, as it ultimately did shortly after being served with this lawsuit on May 8, 2003, we cannot sanction the Puckets' attempt to manufacture a lawsuit designed to challenge the South Dakota Constitution provisions without having met the essential elements of standing. Therefore, the Puckets lack standing to challenge the failure to reinstate busing between March 3 and May 16, 2003, because they failed to take even the simple step of requesting that the School District resume busing, which we cannot conclude would have been futile.

## III.  CONCLUSION

Accordingly, we affirm the dismissal of this lawsuit because the Puckets lack standing.

_____