# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1983

_____

Kent Bernbeck

*Plaintiff - Appellee*

v.

John A. Gale, Nebraska Secretary of State

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: February 12, 2016
Filed: July 14, 2016

_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

_____

BEAM, Circuit Judge.

Kent Bernbeck brought claims under 42 U.S.C. § 1983 against two public officials in their official capacities, alleging that the procedures they enforce for placing initiatives on Nebraska state and municipal ballots violate his rights under the First and Fourteenth Amendments to the Constitution of the United States, and seeking declaratory and prospective injunctive relief. The district court dismissed all

but the Fourteenth Amendment claim against Nebraska Secretary of State John Gale, entered judgment for Bernbeck on that claim, enjoined Gale from enforcing certain provisions of the Nebraska Constitution, and awarded Bernbeck attorneys' fees and costs. Gale appeals from both the judgment and the award of attorneys' fees. Because Bernbeck does not possess standing to bring his Fourteenth Amendment claim against Gale, we now vacate in part and remand with instructions to dismiss without prejudice.

## I. BACKGROUND

Article III § 2 of the Nebraska Constitution provides in relevant part:

The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature. This power may be invoked by petition wherein the proposed measure shall be set forth at length. If the petition be for the enactment of a law, it shall be signed by seven percent of the registered voters of the state, and if the petition be for the amendment of the Constitution, the petition therefor shall be signed by ten percent of such registered voters. In all cases the registered voters signing such petition shall be so distributed as to include five percent of the registered voters of each of two-fifths of the counties of the state, and when thus signed, the petition shall be filed with the Secretary of State who shall submit the measure thus proposed to the electors of the state . . . .

Until 1994, Article III § 4 of the Nebraska Constitution required that the number of petition signatures needed to satisfy § 2 be calculated as a percentage of the total number of voters that participated in the immediately preceding gubernatorial election. In Duggan v. Beermann, 515 N.W.2d 788 (Neb. 1994), however, the Nebraska Supreme Court held that this requirement had been impliedly repealed by an earlier amendment to § 2 and that the required number of petition signatures

should instead be calculated as a percentage of total registered voters in the state at the time the petition is filed with the Secretary of State. The practical effect of this decision, in Bernbeck's opinion, was to greatly increase the number of petition signatures needed to place an initiative on the statewide ballot.

Bernbeck, a resident of Douglas County, Nebraska, is a frequent participant in Nebraska's initiative process, having sponsored or cosponsored five statewide initiative petitions and having provided consultation or assistance on four others. Unhappy with the increased burden Duggan placed upon his efforts, Bernbeck filed two sworn statements with Gale–in January 2012 and again in July–that he was sponsoring a petition drive to amend the Nebraska Constitution to return the petition-signature thresholds for ballot initiatives to their pre-Duggan levels. His July filing also included a sample petition form. Bernbeck stipulated that he never filed a signed petition with Gale, and the record contains no clear indication that he ever went about collecting signatures for that initiative.

Around the same time, Bernbeck circulated petitions in various Nebraska cities and towns for placement of an initiative on their respective municipal ballots. Although the stipulated record on which this case was decided does not specify the objective of this initiative, Bernbeck's complaint alleges it proposed "an ordinance to require associations receiving municipal funds to disclose and publish in a local newspaper of record, all activity taken to influence the Nebraska Legislature, including support and/or opposition to municipal and statewide ballot measures." The Village of Denton, Nebraska, refused to place Bernbeck's initiative on the ballot because he paid petition circulators by the signature in then-contravention of Nebraska law. See Neb. Rev. Stat. § 32-630(3)(g) (Reissue 2008 & Cum. Supp. 2014) (repealed 2015). That dispute was fully litigated in Nebraska state court.

Bernbeck brought claims under § 1983 against both Gale and Charlotte TeBrink, clerk of the Village of Denton. Bernbeck alleged that Gale's enforcement of the Nebraska Constitution's "signature-distribution" requirement for initiatives–that an initiative petition contain signatures of at least 5% of the registered voters of each of two-fifths of Nebraska's counties in order to be placed on the statewide ballot–violated his rights under the First Amendment (incorporated through the Fourteenth) to political expression and to petition the government, as well as his voting rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. He also alleged TeBrink's enforcement of the paid-circulator prohibition violated his First Amendment rights. The district court found Bernbeck's claims against TeBrink precluded by the previous state-court litigation and dismissed his First Amendment claims against Gale. The district court concluded, however, that the signature-distribution requirement diluted Bernbeck's right to vote in violation of the Fourteenth Amendment. It enjoined Gale from enforcing the relevant provisions of §§ 2 and 4 of the Nebraska Constitution and awarded Bernbeck attorneys' fees and costs. Gale appeals, arguing the district court erred both in its decision and its calculation of attorneys' fees.

## II.   DISCUSSION

Standing, although not raised by the parties on this appeal, is a "jurisdictional prerequisite" and thus "a threshold issue that we are obligated to scrutinize," sua sponte if need be. Curtis Lumber Co. v. La. Pac. Corp., 618 F.3d 762, 770 & n.2 (8th Cir. 2010) (first passage quoting Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir. 2007)). This is because "[j]udicial power to review the legality of official action exists only as an incident of the duty to determine the law applicable to a case properly before the court." 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.1 (3d ed. 2008). We review a party's standing de novo. Curtis Lumber, 618 F.3d at 770. Standing requires that in order

-4-

[t]o seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). Because these requirements are "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). This case comes to us at the conclusion of a bench trial, and so we look to see that Bernbeck has proven the elements of standing by a preponderance of the evidence.

Bernbeck's Fourteenth Amendment claim against Gale rests on the allegation that the signature-distribution requirement burdens his rights by placing attenuated value and influence upon the signatures of each voter from a highly populated county as compared with the signatures of each voter from a less populated county. Nebraska is a largely rural state and, according to stipulated figures taken from a U.S. Census Bureau estimate, in 2012 Douglas County–home to Omaha–encompassed roughly 28.7% of Nebraska's total population, which is spread across 93 counties. Thus, according to Bernbeck, the signature of a voter in a rural county on an initiative petition goes further in reaching the target of 5% of that county's registered voters than does the signature of a voter who resides in Douglas County. Bernbeck's complaint can fairly be read as claiming that this disparity invades two distinct interests of his: (1) it burdens his "individual voice and vote as a petition circulator" and (2) it "makes his vote less meaningful than the vote of any other Nebraska voter in any other Nebraska county." Read generously, Bernbeck in short claims both an

interest as a petition circulator[1] in putting his initiative onto the statewide ballot and an interest as one who signs an initiative petition in parity between his signature and those of Nebraskans residing in other counties. Cf. Roberts v. Wamser, 883 F.2d 617, 622 (8th Cir. 1989) (discussing divergent interests of candidates and voters). We address each of these interests in turn.

## A.      Bernbeck's Interest in Placing an Initiative on the Ballot

Bernbeck alleges in his complaint that the signature-distribution requirement violates the one-man-one-vote principle applied to state legislative elections announced in Reynolds v. Sims, 377 U.S. 533 (1964), "because it prevents an initiative petition issue from reaching the voters of Nebraska" despite meeting § 2's other requirements. Putting aside the merits of this contention, Bernbeck essentially claims injury from Gale's enforcement of the signature-distribution requirement. Certainly Bernbeck has not proven that this injury is actual. It is undisputed that Bernbeck never submitted a signed petition, and so it is not possible for Gale to have enforced the signature-distribution requirement by rejecting a submitted petition for noncompliance.[2] The only sense in which Bernbeck can be said to have been injured, then, is imminently. The district court found that Bernbeck was injured because "[h]e has a specific initiative he wishes to undertake at this time." We conclude that this

---

[1] It would be more accurate to say that Bernbeck is a petition "sponsor," as there is no record evidence that he circulated any petitions for the placement of an initiative on the statewide ballot.

[2] Of course any past rejection of petitions cannot support the existence of an injury in the present case; "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Lujan, 504 U.S. at 564 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).

-6-

wish, even if evidenced by a sworn statement and sample petition filed with Gale, is insufficient to establish an imminent threat of enforcement.

As the Supreme Court made clear in Lujan, a wish to engage in future conduct, alone, does not provide the immediacy needed for threatened enforcement of a contested law to constitute injury in fact. 504 U.S. at 564 n.2. The concept of immediacy is

> stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly *within the plaintiff's own control*. In such circumstances we have insisted that the injury proceed with a *high degree* of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

Id. (emphasis added). Bernbeck's claim rests on a desire to engage in future conduct at an unspecified and indefinite time,[3] and the acts necessary to bring his injury into existence are entirely within his control. The high degree of immediacy he must prove cannot, it seems to us, be met by a mere statement of intent. This conclusion

---

[3]At the time he submitted his statement and sample petition form on July 23, 2012, Bernbeck had until July 4, 2014, to submit signed petition forms to Gale in order to place that issue on the ballot. See Neb. Rev. Stat. §§ 32-1405(1), -1407(1), (2); see also Neb. Const. art. XVII § 4 (defining "general election"). Bernbeck has at most proven an intent to submit signed petition forms at an unspecified time, and acting on that intent could only have given rise to his claimed interest within a roughly two-year period. We understand Lujan to require a greater degree of definiteness than this. 504 U.S. at 564 ("Such 'some day' intentions–without any description of concrete plans, or indeed even any specification of *when* the some day will be–do not support a finding of the 'actual or imminent' injury that our cases require.").

-7-

comports with our precedent. "[I]f a plaintiff is required to meet a precondition or follow a certain procedure to engage in an activity or enjoy a benefit and fails to attempt to do so, that plaintiff lacks standing to sue because he or she should have at least taken steps to attempt to satisfy the precondition." Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1161 (8th Cir. 2008); see also Constitution Party of S.D. v. Nelson, 730 F. Supp. 2d 992, 998-99 (D.S.D. 2010) (finding plaintiff who did not "even attempt to comply with" challenged signature threshold lacked standing), vacated in part on other grounds, 639 F.3d 417 (8th Cir. 2011). This is not a situation where an attempt to comply with a challenged requirement would have been futile. At oral argument, counsel suggested Bernbeck possessed standing because his attempt to place his petition on the statewide ballot was effected through the municipal petition drives, which were an attempt to change the municipal initiative and referendum process "as a way to try and get attention to his issue." We fail to see the connection between these municipal drives, which as far as we can ascertain from Bernbeck's complaint pertain to fiscal disclosure, and his efforts to repeal Duggan. And in any event § 2 does not apply to municipal initiatives. See City of North Platte v. Tilgner, 803 N.W.2d 469, 486 (Neb. 2011). Bernbeck offers no persuasive justification for his foregoing entirely the very procedure he asks us to review.[4]

---

[4]The dissent relies on cases that center on a claimed violation of the fundamental right to vote in an election of political representatives. Bernbeck, instead, claims an invasion of his state-created right to participate in initiatives and referenda, a right which courts have consistently recognized is not provided by the United States Constitution. See Dobrovolny v. Moore, 126 F.3d 1111, 1113 (8th Cir. 1997) ("[T]he right to a state initiative process is not a right guaranteed by the United States Constitution, but is a right created by state law."); Kendall v. Balcerzak, 650 F.3d 515, 522-23 (4th Cir. 2011); Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210-11 (10th Cir. 2002); Taxpayers United for Assessment Cuts v. Austin, 994 F.2d 291, 296 (6th Cir. 1993). Indeed, the state retains the authority to interpret the scope and availability of any such state-conferred right or interest, not the federal courts. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim

asserted." Warth v. Seldin, 422 U.S. 490, 500 (1975) (citation omitted). What may constitute the invasion of a deeply fundamental, constitutionally recognized right to vote cannot be assumed to apply interchangeably with the state-created, nonfundamental right to participate in initiatives and referenda. We have yet to find a case involving *that* right where the state did not first enforce the challenged restriction.

This distinction also highlights the tenuous nature of Bernbeck's equal protection claim, were we to reach the merits. But even without analysis of the merits of the equal protection argument, it is clear that none of Bernbeck's claims are tethered to any constitutional mandates found in Section 2 of Amendment 14 of the United States Constitution. On the other hand, as previously indicated, a significant number of the dissent's case precedent presents direct connection to one or more of the specifically alluded to protective edicts found in Section 2. Accordingly, it is virtually certain that Bernbeck fails to state an actionable equal protection claim in this case. And it is equally clear that if he could have stated an equal protection cause of action, the required rational basis analysis would have doomed any such claim.

The dissent also focuses on Bernbeck's claimed injury from the cost and effort of traveling the state collecting signatures. But this economic injury relates to Bernbeck's First Amendment claim–that his right to engage in political expression and association through the initiative process is unduly burdened by obstacles that restrict his ability to place his initiative on the ballot. We are reviewing only the district court's judgment on his right-to-vote claim anchored to the Equal Protection Clause, which is grounded on his alleged right to have signatures equally valued. Bernbeck neither alleged nor argued that Nebraska has disparately imposed the burdens of collecting signatures. "[A] plaintiff must demonstrate standing for each claim he seeks to press." Davis v. FEC, 554 U.S. 724, 734 (2008) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)). The relevant injury for our purposes is the one which Bernbeck claims violates the Equal Protection Clause–that the signature-distribution requirement "dilutes, cheapens and debilitates a plaintiff's individual voice and vote as a petition circulator"–and nothing more. Bernbeck did not collect and submit a single signature for the initiative at issue, so he has not presented evidence that any signature was "dilute[d], cheapen[ed] [or] debilitate[d]."

As to the dissent's argument that Bernbeck has presented evidence proving submission of the petition from Bernbeck's January 2012 filing would have been futile, we read his declaration differently. It is true Bernbeck declared that "[a]s of the July 2012 signature deadline, we failed to meet the distribution requirements and the signature threshold for our constitutional amendment to be placed on the November 2012 ballot." But rather than infer from this statement an attempt to gather petition signatures to satisfy the signature-distribution requirement, we look instead to the following four subparagraphs in the declaration in which Bernbeck specifies the efforts he undertook. The first three relate his difficulties in hiring petition circulators because of his inability to pay them by the signature. He does reference gathering signatures, but only for the limited purpose of gathering samples to "test participation rates, signature validity rates and number collected per hour" in order to calculate an hourly rate for signature gatherers. The fourth subparagraph describes an effort to collect signatures to meet the signature-distribution requirement, but it is entirely unclear whether Bernbeck is referring to his own petition, that of Sharon Crachey, a sponsor of a separate but similar petition, or both. Such nonspecific, ambiguous statements fail to amount to affirmative evidence of futility. Further, we do not agree that this statement provides evidence that "Bernbeck's July 2012 petition would have been as unsuccessful as his January 2012 petition." Post at 20. Bernbeck had five months to meet the requirement for his January 2012 petition but roughly two years for his July 2012 petition. As we explained above, we also disagree with the dissent's position that a "definite time frame" of two years satisfies Lujan. Post at 16.

The precedent relied upon by the dissent is distinguishable on the bases outlined above. Besides centering on the right to vote, in many of these cases either the plaintiffs did in fact collect and submit signatures, attempted compliance with the challenged restriction would have been futile, or the claims involved burdens like those raised in Bernbeck's First Amendment claim. Contrary to the dissent's characterization, the decision in Storer v. Brown, 415 U.S. 724 (1974), does not specify whether petitions bearing signatures were submitted by the plaintiffs to and rejected by the State. But the appellants' own brief asserted that the two relevant plaintiffs–Hall and Tyner–"collected and properly filed 25,000 nomination signatures," and that "[a]ppellees refused to place their names on the ballot, relying on [specified] provisions of California law." Brief of Appellants at 9, Storer v. Brown, 415 U.S. 724 (1974) (No. 72-812). The Court's determination in footnote

## B.    Bernbeck's Interest as a Petition Signer

The only other plausible basis on which Bernbeck can claim to have been injured is in his interest as a resident of Omaha in parity between his petition signature and those of registered voters in other counties. But Bernbeck must be able to point to some evidence in the record that he possesses this interest. The right to have one's signature counted on a petition extends only to those registered to vote in Nebraska. Neb. Rev. Stat. § 32-1404. Nowhere in the complaint nor in the record can we find any averment or evidence that Bernbeck is registered to vote. Cf. Baker v. Carr, 369 U.S. 186, 204 (1962) (finding standing to challenge apportionment statute where appellants were "allegedly qualified to vote"). Therefore he has failed to prove he has standing to assert this interest as well.[5]

## III.   CONCLUSION

Because we conclude Bernbeck does not possess standing to bring his Fourteenth Amendment claim, we are without authority to do anything but vacate that

nine that Hall and Tyner possessed standing was made in response to the State's argument that as a general matter only electors, not aspiring candidates, have standing to challenge signature requirements. Storer, 415 U.S. at 738 n.9. Our decision does not contradict that determination in any way.

For these reasons, we think the dissent's concerns, though important, are not implicated by this case as it comes before us.

[5]Contrary to the dissent, we believe Bernbeck's allegation that he is a "single voter," unsubstantiated by any record evidence, falls short of his evidentiary burden. (Incidentally, Nebraska law does permit unregistered voters to participate in elections in limited circumstances. See Neb. Rev. Stat. § 32-933(1)(a).)

portion of the district court's judgment and remand with instructions to dismiss that claim without prejudice.[6]

KELLY, Circuit Judge, dissenting.

In my view, Kent Bernbeck has standing to bring this suit to challenge the Nebraska Constitution's "signature-distribution requirement." See Neb. Const. art. III § 2. Under that provision, an individual seeking to place an initiative on the ballot must collect signatures in support of the initiative from at least five percent of the registered voters in at least two-fifths of Nebraska's 93 counties. Bernbeck contends, and the district court agreed, that this requirement violates the Equal Protection Clause because Nebraska's counties vary widely in population, so the signature-distribution requirement gives disproportionate influence to voters in sparsely-populated counties. Instead of dismissing his case for want of jurisdiction, a ground neither party was given a chance to brief to this court, I believe the court should consider and decide Bernbeck's claim that Nebraska's signature-distribution requirement for placing initiatives on the ballot violates the Equal Protection Clause.

Bernbeck stated and evidenced an intention to place a specific initiative on the November 2014 ballot, an intention that he alleges would be thwarted – or at least made more expensive – by Nebraska's signature-distribution requirement. Courts have consistently held that an intention to gain access to a ballot in a specific upcoming election confers standing to challenge ballot-access restrictions, regardless of whether the challenger attempted to satisfy the restrictions. See Storer v. Brown,

_____

[6]Because we are without jurisdiction to entertain this claim, we are also precluded from accepting Bernbeck's invitation to affirm the judgment on the alternate ground of a First Amendment violation, which claim he did not cross-appeal.

-12-

415 U.S. 724, 738 n.9 (1974) (holding that "it is [the candidates'] names that go on the California ballot for consideration of the voters" and "[w]ithout the necessary signatures this will not occur," so "[i]t is apparent . . . that [they] have ample standing to challenge the signature requirement");[7] Green Party of Tenn. v. Hargett, 767 F.3d 533, 542–45 & n.1 (6th Cir. 2014) (holding that plaintiffs had standing to pursue ballot-access claim despite not complying with signature-gathering requirement); Nader v. Keith, 385 F.3d 729, 736 (7th Cir. 2004) ("There would be no question of [plaintiff's] standing to seek [an injunction to place him on the ballot] in advance of the submission or even collection of any petitions."); Texas Indep. Party v. Kirk, 84 F.3d 178, 187 n.9 (5th Cir. 1996) (holding that candidates had standing to challenge requirement that signature petitions include voter registration numbers despite not having submitted petitions); Stevenson v. State Bd. of Elections, 638 F. Supp. 547, 549 (N.D. Ill.) ("The defendants in this case all suggest that the plaintiffs have no standing because they have not tendered at this late date their petitions before the board and had them rejected. But this gesture of formality is unnecessary."), aff'd 794 F.2d 1176 (7th Cir. 1986) (adopting district court opinion); see also Am. Party of Tex. v. White, 415 U.S. 767, 778–79 (1974) (deciding challenge by Texas New Party to requirement that parties gather signatures of 1% of voters to qualify for ballot despite fact that it "apparently made no effort to comply with the 1% requirement"); Williams v. Rhodes, 393 U.S. 23, 28 (1968) (deciding appeal regarding signature requirement for Socialist Labor Party despite the fact that "it ha[d] not filed petitions with the total

---

[7]The court attempts to distinguish Storer, alone among the cited cases, on its facts, pointing out that two of the petitioners claimed in their brief to have submitted 25,000 signatures. Ante at 8 n.4. But the point of the lawsuit was that the 25,000 signatures fell far short of the number California required of the candidates to place their names on the ballot – a number the respondents estimated at 325,000. Storer, 415 U.S. at 739. It is true that no party in Storer advanced the approach to standing that this court now endorses, but what Storer held was that a candidate who seeks to place his or her name on a ballot and is prevented from doing so by a signature-gathering requirement has standing to challenge that requirement. That holding is inconsistent with the court's decision here.

-13-

signatures required under new Ohio laws for ballot position, and indeed it conceded it could not do so this year"); Jenness v. Fortson, 403 U.S. 431, 432 (1971) (deciding challenge to requirements for filing petition to run as independent candidate despite fact that petitioners had not submitted petitions); McCarthy v. Briscoe, 429 U.S. 1317, 1319, 1323–24 (1976) (Powell, J., in chambers) (ordering Texas to put Eugene McCarthy's name on ballot despite the fact that he had not attempted to qualify for the ballot by joining a political party); Lee v. Keith, 463 F.3d 763, 765, 767 (7th Cir. 2006) (deciding challenge from candidate though "he could not muster the required number of signatures by the deadline so distant from the general election" because the "statutes [he] challenges thwarted his bid to appear on the ballot and continue to restrict potential independent candidacies").[8]

---

[8]The court dismisses these cases on the basis that the right to vote for political representatives, unlike the right to participate in initiatives, is provided by the United States Constitution. Ante at 8 n.4. But in point of fact, many of the cited cases involve federal presidential elections, and "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." Bush v. Gore, 531 U.S. 98, 104 (2000) (per curiam); see Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9 (1982) ("[T]he Constitution 'does not confer the right of suffrage upon any one.'" (quoting Minor v. Happersett, 88 U.S. (21 Wall.) 162, 178 (1874)); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 n.78 (1973) (noting that "the right to vote, *per se*, is not a constitutionally protected right"). Consistent with this principle, a number of states did not hold popular elections to choose their presidential electors until decades after the ratification of the Constitution; South Carolina's electors were chosen by its legislature as late as 1860. See McPherson v. Blacker, 146 U.S. 1, 29–33 (1892). The constitutional guarantee of equal protection comes into play only when the state decides to grant its citizens the right to vote for presidential electors. See Bush, 531 U.S. at 104–05 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); San Antonio Indep. Sch. Dist., 411 U.S. at 45 n.78 (explaining that "the right to vote" is shorthand for the right "to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective

-14-

Indeed, it is unclear what more the court would demand of Bernbeck before allowing him to challenge the signature-distribution requirement. Would it be enough to simply make an unsuccessful effort to collect signatures? Would he have to submit a signature verification that lacked an adequate number of signatures, knowing that government officials would have to reject it? Or would he be required to satisfy the signature-distribution requirement and submit a valid signature verification in order to be able to argue to a court that the signature-distribution requirement was barring his access to the ballot?

The court relies on two precedents, neither of them voting-rights cases, to conclude that Bernbeck lacks standing. The first, Lujan v. Defenders of Wildlife, involved a challenge by environmental groups to an agency interpretation of the Endangered Species Act of 1973, which they claimed would increase the rate of extinction of endangered species. See 504 U.S. 555, 562 (1992). The Supreme Court held that one of the organizations could not establish standing based on the fact that two of its members intended to travel to observe some of the allegedly affected species at some indefinite point in the future. See id. at 563–64. Crucial to the Court's analysis was the fact that the members in question had not specified when they planned to view the endangered animals: It explained that "'some day'

process for determining who will represent any segment of the State's population"). In this respect state initiatives are exactly parallel to presidential elections: the state is not obligated to provide for them, but must respect the Equal Protection Clause if it chooses to do so.

But even if there were a distinction between the constitutional protection afforded to voting for candidates as opposed to initiatives, that would simply go to the merits of Bernbeck's claims, not his standing. The difference between a classification that affects a fundamental right and one that does not is that challenges to the former trigger heightened scrutiny. See Stiles v. Blunt, 912 F.2d 260, 263 (8th Cir. 1990). However, there is no difference in what a plaintiff must demonstrate to show standing.

-15-

intentions – without any description of concrete plans, or indeed any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564.

This case is quite unlike Lujan in that Bernbeck's injury was not alleged to occur at "some indefinite future time," but within a definite time frame:  by the next election. Id. at 564 n.2.  Bernbeck didn't just state an intention to place an initiative on the November 2014 ballot, he backed up his intentions by submitting to the Nebraska Secretary of State on July 23, 2012, a sworn statement and sample initiative petition, the first step to placing an initiative on the ballot.  Under Nebraska law, the sworn statement and sample petition would have expired if Bernbeck did not manage to file a petition with sufficient signatures by July 4, 2014. See Neb. Rev. Stat. §§ 32-1407(1)–(2).  As a result, there would have been no point to filing them unless Bernbeck meant to place an initiative on the *November 4, 2014*, ballot – the ballot for the "next general election occurring at least four months after" the filing – as opposed to some ballot in the indefinite future. Id.

The second precedent relied on by the court is Pucket v. Hot Springs School District No. 23-2, which held that when there is a precondition to receiving a government benefit, a plaintiff must attempt to satisfy the precondition in order to have standing to challenge the denial of the benefit. See 526 F.3d 1151, 1161 (8th Cir. 2008).  Pucket involved a challenge by students and parents at a private religious school to their local school district's decision to end busing services. See id. at 1154. This court dismissed the case for lack of standing, in part because the plaintiffs never requested that the school district reinstate busing. See id. at 1161–62.

But in this case, gathering signatures is not a "precondition" to receiving a government benefit, the denial of which would constitute an injury – it is *itself* the

alleged injury. Bernbeck alleges he was injured not just by his inability to place an initiative on the November 2014 ballot, but by the increased cost of gathering signatures in Nebraska's sparsely-populated counties imposed by the signature-distribution requirement. Bernbeck's complaint states that because of the signature-distribution requirement,

> [t]he human resources costs, financial resources costs, and time resources costs of exercising his rights are dramatically increased because he must [de]ploy his time and the time of others to sparsely populated counties to collect only a few signatures at a substantially greater human resources, time and financial cost.

The court suggests that this alleged injury is relevant only to Bernbeck's First Amendment claim, but that is not what his complaint says.[9] Rather, his claim is that because the signature-distribution requirement overweights the signatures of residents of sparsely-populated counties in violation of the Equal Protection Clause, he has to spend money gathering signatures in those counties that he otherwise would not have to spend.

---

[9]Moreover, the court's suggestion that this alleged injury is relevant to Bernbeck's First Amendment claim is inconsistent with its later conclusion that it lacks jurisdiction even over his First Amendment claim. Ante at 12 n.6. Bernbeck did not cross-appeal the denial of his First Amendment challenge to the signature-distribution requirement, but he didn't have to: because success on the First Amendment claim would entitle Bernbeck to the same relief he obtained below, the claim is simply an alternative ground for affirmance. See United States v. Hirani, — F.3d —, 2016 WL 3064743, at *7 (8th Cir. May 31, 2016) ("We review judgments, not opinions, and we may affirm a judgment on any ground supported by the record." (citation omitted)); Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) ("[T]he party that prevailed in the district court need not file a cross-appeal to raise alternative grounds for affirmance." (citation omitted)).

If Bernbeck had attempted to gather signatures, he would have incurred economic harm that would result in standing. See Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1029 (8th Cir. 2014) ("When the alleged harm is 'economic,' 'the "injury in fact" question is straightforward.'" (citation omitted)); Krislov v. Rednour, 226 F.3d 851, 857 (7th Cir. 2000) (holding that plaintiffs suffered injury because they "were required to allocate additional campaign resources to gather signatures"). The same is true even though Bernbeck's "own acts . . . eliminate[d] the imminent threat of harm." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 (2007) (holding that patent licensee had standing to challenge patent's validity despite the fact that its payment of royalties "ma[de] what would otherwise be an imminent threat [of suit] at least remote, if not nonexistent"). If a "rule that a plaintiff must destroy a large building, bet the farm, or . . . risk treble damages and the loss of 80 percent of its business before seeking a declaration of its actively contested legal rights finds no support in Article III," neither does a rule that a plaintiff must spend the money needed to collect signatures in order to litigate the validity of the signature-gathering requirement. Id. at 134. Say the Nebraska Constitution required residents of sparsely-populated counties to pay a fee of $50 to place an initiative on the ballot, but required residents of the most populous counties to pay $500,000. Under the court's rationale, Bernbeck, as a resident of a populous county, would be unable to bring an equal protection challenge without attempting to satisfy the "precondition" by paying the half-million-dollar fee. That cannot be right.

But even assuming for the sake of argument that attempting to satisfy the signature-distribution requirement is a "precondition," as Pucket defines the term, Pucket made clear that "we may find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile." Pucket, 526 F.3d at 1162 (collecting cases). The record here indicates that it would have been futile for Bernbeck to attempt to gather signatures for the petition he submitted on July 23, 2012. It is possible to say this with some assurance because

-18-

Bernbeck submitted almost the exact same petition in January 2012, and undertook considerable efforts to gather signatures for it, "travel[ing] and sp[eaking] at gatherings, meetings and collect[ing] signatures throughout the state in an effort to qualify the requisite number of counties as dictated by the signature distribution requirements set out in the State Constitution." But these efforts were unsuccessful because of the signature-distribution requirement:

> In January, 2012, I submitted a signed affidavit to the Secretary of State to initiate a constitutional amendment to the State Constitution to lower signature thresholds for statewide initiative and referendum petitions. . . . The deadline for submission of signatures was July, 2012. As of the July 2012 signature deadline, we failed to meet the distribution requirements and the signature threshold for our constitutional amendment to be placed on the November 2012 ballot. I believe the resources spent qualifying rural Nebraska counties had a severe and contributing impact on my ability to gain ballot placement.

These events convinced Bernbeck that attempting to satisfy the signature-distribution requirement again would be futile; in a declaration filed with the district court, he stated:

> I realized that my right to engage in expression of my interest in ballot issues was persistently being thwarted by State laws . . . requiring that I achieve a virtually impossible geographic distribution of petition signers. . . . Even if I achieved enough signatures to reach the total number of all signatures required as a fraction of the entire general election vote at the preceding election for Governor by circulating my petitions in Douglas and Lancaster Counties only, my efforts would fail because I did not have enough signatures from the least populous counties in the state.

As there was no countervailing evidence submitted by Nebraska's Secretary of State, the sole evidence in the record indicates that Bernbeck's July 2012 petition would have been as unsuccessful as his January 2012 petition, rendering any attempt to gather signatures futile. Under these circumstances, his failure to attempt to gather signatures to place his initiative on the ballot does not deprive him of standing.

Finally, Bernbeck has an independent basis for standing based on his interest as a petition signer. The court recognizes this possibility, but rejects it on the basis that "[n]owhere in the complaint nor the record can we find any averment or evidence that Bernbeck is registered to vote." Ante at 11. But paragraph 37 of Bernbeck's complaint states that "Bernbeck is a single voter." The most reasonable reading of this statement is that Bernbeck is a registered voter, for there is no such thing as an unregistered voter except in the limited circumstance of a new arrival to Nebraska. See Neb. Rev. Stat. § 32-933(1)(a). Bernbeck's status as a registered voter qualifies him as a petition signer, and provides an independent basis for standing to challenge laws restricting access to the ballot. See McLain v. Meier, 851 F.2d 1045, 1048 (8th Cir. 1988) (holding that a candidate had standing as a voter to challenge restrictive ballot-access laws).

Because Bernbeck has standing to bring his equal protection challenge, I would proceed to the merits of this case.

_____