# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-3624

_____

F.B.; M.B., individually and as natural guardians and next friends of their child,
L.B.; L.B., individually, a minor

*Plaintiffs - Appellants*

v.

Our Lady of Lourdes Parish and School

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 26, 2024
Filed: January 14, 2025

_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.

_____

SMITH, Circuit Judge.

F.B. and M.B. filed suit on behalf of themselves and their minor child L.B. (collectively, "plaintiffs") under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. They alleged that Our Lady of Lourdes Parish and School (Lourdes) violated Section 504 by failing to comply with various procedural standards and requirements

mandated in the implementing regulations. Lourdes moved to dismiss, arguing that Section 504 does not create a private right of action for claims based solely on an alleged failure to comply with the implementing regulations' procedural standards and requirements. The district court granted the dismissal motion, holding that Section 504 does not provide for such a private right of action. The plaintiffs, however, lack Article III standing to bring their claims because their alleged injury is not fairly traceable to Lourdes's actions and the relief sought would not redress their alleged injury. We vacate the district court's judgment and remand with instructions to dismiss for lack of jurisdiction.

## I. *Background*[1]

L.B. "was diagnosed with ADHD in third grade and took medications for that condition" but "experienced adverse side effects from the medications." R. Doc. 94, at 3. Additionally, she suffered from "reduced vision." *Id.* L.B. "struggled with academic work in school, with fine motor skills, and with organizational skills and routines of daily living in school and at home." *Id.*

In December 2015, when L.B. "was ten years old . . . and midway through fifth grade," she received "a cognitive and academic evaluation . . . from the St. Louis Learning Disabilities Association, Inc." *Id.* The certified school psychiatrist who conducted the evaluation "concluded that L.B.'s academic difficulties were due to processing deficits in aspects of working memory that made it more difficult [for L.B.] to 'juggle' multiple parts of tasks." *Id.* "The evaluation contained a number of recommendations to accommodate L.B.'s deficits in memory, attention[,] and fine motor skills." *Id.* at 4.

---

[1]"We recite the facts as alleged in the second amended complaint, viewing them in the light most favorable to [the plaintiffs]." *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 770 (8th Cir. 2020).

"[D]uring the second half of the 2015–16 school year," L.B. enrolled in Lourdes. *Id.* at 2. Shortly after her arrival, L.B.'s "[p]arents provided the evaluation to Lourdes, and in a meeting with the [p]rincipal and a special education teacher, Lourdes accepted the evaluation and agreed to provide services and accommodations to L.B. . . . through a Learning Plan." *Id.* at 4. Lourdes "regarded L.B. as a student with a disability" and accommodated L.B. through "the provision of study guides and teacher notes, supervision in writing down homework assignments[,] . . . [providing] an extra set of books at home[,] . . . . preteaching new reading vocabulary, providing questions prior to reading, sending passages home, allowing computation aides and a calculator in math, and many other in-class accommodations." *Id.*

After Lourdes implemented these accommodations, L.B.'s "experience in school improved significantly." *Id.* "However, . . . the school principal left and was replaced by a new principal who refused to require the teaching staff to provide the accommodations." *Id.* at 5. During the fall semester of the 2016–2017 school year, L.B.'s "parents learned that the agreed-upon accommodations were not being provided." *Id.* "L.B. began to receive failing grades in school and failed to turn in assignments." *Id.* As a result, "[h]er parents sent numerous written communications to L.B.'s teachers[;] the principal of Lourdes[;] and the pastor of Our Lady of Lourdes Parish, Father Jim Theby, in an effort to resolve the problems." *Id.* They "asserted that L.B.'s failure to turn in assignments could have been resolved by implementing the accommodations in L.B.['s] Learning Plan." *Id.* "In January[] 2017, the new principal informed L.B.'s parents that the list [of accommodations] was 'outdated' and no longer would be adhered to." *Id.*

"[D]uring the 2017–18 school year," "L.B.'s parents complained that . . . L.B. would spend most afternoons in the hallway, making up homework and missing that day's classwork, and that the principal and her teacher made disparaging remarks to her when they walked by her in the hall." *Id.* at 6. "On December 6, 2017, after three unsuccessful attempts to schedule a meeting [with the principal], M.B. wrote to the

principal, expressing her concerns about L.B.'s Learning Plan." *Id.* at 7. The principal met with L.B.'s parents the following day. "The principal was completely unaware of L.B.'s Learning Plan" but "said she would locate it, review it, and then get back to them with a plan to move forward." *Id.* After "[t]he principal took no action," M.B. complained in writing to Father Theby on December 13, 2017. *Id.*

On February 9, 2018, L.B.'s parents met with the principal, Father Theby, and L.B.'s teachers. "The participants discussed the accommodations on the checklist that Lourdes had agreed to provide, and the teachers agreed to provide the accommodations and left the meeting." *Id.* at 8. After the teachers left the meeting, Father Theby "was visibly upset with the parents. He stated that he had been reading M.B.'s email correspondence with Lourdes staff, and he did not think Lourdes was a good fit for any of the family's children." *Id.* at 9. F.B. defended his wife's emails "and noted that the only change since the list of accommodations was developed was the change in principal. In response, the principal smiled and said she was not going anywhere. F.B. stated that 'we will see about that.'" *Id.* "Father Theby [then] accused F.B. of threatening the principal and informed F.B. and M.B. that their family, including their three children who had been attending Lourdes as students, no longer was welcome at the Lourdes School and that they should leave immediately." *Id.*

"None of the family's children returned to Lourdes after the expulsion. They were homeschooled for the rest of the school year and lost a year of school." *Id.*

On February 8, 2022, the plaintiffs, along with three other family members identified as I.B., E.B., and El.B. (collectively, "original plaintiffs"), filed suit against Lourdes, the Archdiocese of St. Louis, and the Archbishop. Relevant to the present case, their original complaint alleged that Lourdes violated Section 504 by discriminating against L.B. because of her ADHD diagnosis by failing to provide proper accommodations. It further alleged that Lourdes retaliated against L.B. in violation of Section 504 by expelling her to due to her disability. All six of the

-4-

original plaintiffs claimed to have suffered emotional damages in excess of $500,000 as a result of Lourdes's actions.

That same year, the Supreme Court decided *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022). *Cummings* held that emotional damages are not available for claims brought under statutes enacted pursuant to the Spending Clause like Section 504. *Id.* at 221–22. Consequently, the original plaintiffs moved for leave to amend their complaint. They professed an intent to "limit the claims to focus on the failure of [Lourdes] to comply with the procedural requirements of Section 504 of the Rehabilitation Act and its implementing regulations" and forgo their substantive claims. R. Doc. 90, at 1. The court granted the motion.

In this newly amended complaint,[2] the plaintiffs asserted a claim under Section 504. Specifically, they claimed that Lourdes

> violated Section 504, 29 U.S.C. § 794 and its implementing regulations by:
>
> a. Failing to establish standards and procedures for the evaluation and placement of students who, because of their disabilities, need or are believed to need special education services[, *see* 34 C.F.R. § 104.35 (b)];
>
> b. Failing to provide L.B.'s parents with procedural safeguards, including prior written notice and opportunity for a hearing[, *see* 34 C.F.R. § 104.36][;]
>
> c. Failing to designate at least one person to coordinate its efforts to comply with Section 504[, *see* 34 C.F.R. § 104.7(a)];

---

[2]The newly amended complaint is the second amended complaint. *See* R. Doc. 94.

d.      Failing to provide continuing notice to its participants that it does not discriminate on the basis of handicap and identifying a responsible employee designated to coordinate its compliance[, *see* 34 C.F.R. § 104.8(a)][;]

e.      Failing to adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by Section 504[, *see* 34 C.F.R. § 104.7(b)]; [and]

f.      Refusing to provide Plaintiffs any grievance procedure to resolve the  complaints they were submitting to Defendants[, *see* 34 C.F.R. § 104.7(b)].

R. Doc. 94, at 12. The plaintiffs requested that the court declare Lourdes in violation of Section 504 and its implementing regulations. They also sought compensatory or, in the alternative, nominal damages.

Lourdes moved to dismiss these claims, arguing that the plaintiffs lacked a private right of action to assert any claims based on Lourdes's alleged failure to comply with Section 504's implementing regulations. The district court granted the motion, agreeing with "the line of cases that hold there is no private right of action to bring a claim based solely on a defendant's failure to comply with Section 504's regulations." R. Doc. 109, at 9.

## II. *Discussion*

The plaintiffs appeal the district court's dismissal of their claims. Specifically, they challenge the district court's conclusion that no private right of action exists to bring their claims based solely on Lourdes's alleged failure to comply with Section 504's implementing regulations. We need not reach this issue, however, because we conclude that the plaintiffs lack Article III standing to bring their claims.

"Standing . . . is a jurisdictional requirement, and thus can be raised by the court sua sponte at any time during the litigation." *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156 (8th Cir. 2008) (internal quotation marks omitted). Article III requires federal courts to "only adjudicate actual cases and controversies." *Id.* at 1157. "Article III standing enforces the Constitution's case-or-controversy requirement." *Id.* (cleaned up). A plaintiff must satisfy three elements to establish standing:

> (1) the plaintiff suffered an injury in fact, (2) [the injury] is fairly traceable to the challenged conduct of the defendant, and (3) [the injury] is likely to be redressed by a favorable judicial decision. Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements.

*Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (citations omitted).

"[E]xplaining who has standing to sue can be different from the private-right-of-action question." *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1217 (8th Cir. 2023). "Even where 'a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right,' a plaintiff cannot 'allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.'" *St. Louis Heart Ctr., Inc. v. Nomax, Inc.*, 899 F.3d 500, 503 (8th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341, (2016). As the Supreme Court has explained:

> For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article III, an injury

in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court. As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

## A. *Causal Connection*

Even if a plaintiff is able to "show injury in fact," the plaintiff must still "establish traceability." *Arc of Iowa*, 94 F.4th at 711. Under Article III, the plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, the plaintiff "must . . . establish that the plaintiff's injury likely was caused . . . by the defendant's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024).

Here, the plaintiffs seek damages and declaratory relief for alleged violations of the procedural regulations implementing Section 504. According to the complaint, the claimed injury was L.B.'s expulsion from Lourdes following her family's request for accommodations. *See, e.g.*, R. Doc. 94, at 10 ("The impact of the expulsion on F.B.'s and M.B.'s children was devastating. All four suffered emotional harm as a direct result of Lourdes'[s] retaliation against them."); *id.* ("The expulsion altered L.B.'s status as a student and caused damage to her reputation in the community."). The complaint, however, fails to establish any causal connection between the regulatory violations that the plaintiffs identify and L.B.'s expulsion. According to the complaint, Lourdes expelled L.B. and her siblings from the school because of

Father Theby's belief that F.B. had threatened the principal. *See* R. Doc. 94, at 9 ("Father Theby accused F.B. of threatening the principal and informed F.B. and M.B. that their family, including their three children who had been attending Lourdes as students, no longer was welcome at the Lourdes School and that they should leave immediately."). We hold that the plaintiffs have failed to show how Lourdes's alleged failure to follow the implementing regulations caused L.B.'s injury—her expulsion.

## B. *Redressability*

The third standing requirement is redressability. *All. For Hippocratic Med.*, 602 U.S. at 380. "[C]ausation and redressability[] are often flip sides of the same coin." *Id.* (internal quotation marks omitted). Therefore, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.

Here, the plaintiffs have requested that the court enjoin Lourdes from "any further action that violates Section 504" and [d]eclare . . . that . . . Lourdes violated Section 504 . . . and its implementing regulations." R. Doc. 94, at 13. Because the complaint failed to tie Lourdes's failure to comply with the implementing regulations to L.B.'s injury—her expulsion—the plaintiffs have not shown how ordering Lourdes to follow the implementing regulations would remedy L.B.'s injury.

Furthermore, the "[p]laintiffs' lawsuit fails to assert any allegation that L.B. was a qualified individual with a disability who was discriminated against based on her disability." R. Doc. 109, at 6; *see also Timothy H. v. Cedar Rapids Cmty. Sch. Dist.*, 178 F.3d 968, 971 (8th Cir. 1999) ("To prevail on a Rehabilitation Act claim under this section, a plaintiff must establish that she (1) is a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on her disability."). Because the complaint fails to allege that L.B. is a qualified individual, the implementing regulations are inapplicable. *See* 34 C.F.R. § 104.1 ("The purpose of

this part is to effectuate [S]ection 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance."). The plaintiffs are asking the federal court to order Lourdes to follow regulatory obligations that are inapplicable to L.B.'s case. *Cf. Allen v. Wright*, 468 U.S. 737, 761 (1984) (explaining that the principle of separation of powers "counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties").

### III. *Conclusion*

The plaintiffs lack Article III standing to bring their claims. Accordingly, we vacate the judgment and remand with instructions to dismiss for lack of jurisdiction.

_____